[Cite as *In re B.D.*, 2022-Ohio-1832.]

STATE OF OHIO     )
                   )ss:
COUNTY OF SUMMIT    )

IN THE COURT OF APPEALS
NINTH JUDICIAL DISTRICT

IN RE: B.D.
     C.D.
     N.D.

C.A. Nos.    30194
              30195
              30196

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE Nos.   DN 19-04-278
             DN 19-04-279
             DN 19-04-280

DECISION AND JOURNAL ENTRY

Dated: June 1, 2022

CALLAHAN, Judge.

{¶1}    Appellant Mother appeals the judgment of the Summit County Court of Common Pleas, Juvenile Division, that placed her children in the legal custody of relatives. This Court affirms.

I.

{¶2}    Mother and Father are the biological parents of N.D., born August 4, 2012; C.D., born July 24, 2015; and B.D., born April 10, 2017. Mother has two older children who are now adults and whose custody is not at issue here. Certain circumstances regarding her adult children, however, are relevant to this appeal.

{¶3}    Mother's now-adult children ("Daughter" and "Son") were the subject children in three separate child welfare cases, including the last one which began in 2018. In April 2019,

while Daughter and Son were under the protective supervision of Summit County Children Services Board ("CSB" or the "agency"), the agency filed complaints alleging that C.D. and B.D. were dependent children, and that N.D. was a dependent and neglected child. The claims were based on allegations that N.D. was not enrolled in school and concerns that Mother and Father were using methamphetamine and engaging in acts of domestic violence. Because CSB was unable to contact Mother who was non-compliant with case plan objectives in the 2018 case involving Daughter and Son, the agency obtained an order of access to the home to investigate the well-being of the three younger children. In addition, CSB was granted an interim order of protective supervision of N.D., C.D., and B.D.

{¶4} Two days later, CSB filed its first amended complaints which included additional factual allegations. In addition to developing the claims regarding drug abuse and domestic violence in the home, the agency alleged that Mother reported that she suffered from untreated bipolar disorder and that she was letting known drug abusers stay in the home. The drug abusers were discarding needles, stealing, and causing physical fights inside the home. CSB further alleged that the home condition was "marginal," in that there was backed up water in the basement; and the home contained "minimal food," specifically, that it was void of staples like milk, eggs, and bread. Eleven days later, CSB filed its second amended complaints in which the agency alleged that Mother and Father had recently tested positive for amphetamines, methamphetamine, and marijuana. After a shelter care hearing, the children were placed in the emergency temporary custody of the agency. The magistrate found that CSB had used reasonable efforts to prevent the removal of the children from their home.

{¶5} Mother and Father were present for adjudication. Both waived their rights to a hearing and stipulated that N.D. was neglected and dependent, and that C.D. and B.D. were

dependent. The parents further stipulated to a finding that CSB had used reasonable efforts to prevent the children's continued removal from their home. The parents again waived their rights to a hearing as to disposition and agreed that the children would be placed in the temporary custody of CSB. The juvenile court enunciated the efforts made by the agency to prevent the children's continued removal and found that those efforts were reasonable.

{¶6} As part of its dispositional orders, the juvenile court adopted the agency's proposed case plan. Pursuant to the case plan, Mother and Father had identical objectives requiring them to (1) obtain substance abuse assessments, follow all recommendations, and submit to random drug screens; (2) obtain mental health assessments and follow all recommendations; (3) discuss intimate partner violence during treatment to develop healthy communication and coping skills; and (4) obtain verifiable income through employment or benefits, provide proof of income, maintain working utilities, apply for necessary financial assistance for food and medical benefits, and sign all necessary releases for information. The case plan noted that Mother's case plan objectives in this case mirrored those ordered in her ongoing 2018 case involving Daughter and Son. Mother signed the case plan.

{¶7} Within a couple months, CSB identified a suitable relative who indicated a tentative willingness to accept placement of the three children. After a series of visits, the agency transitioned N.D. into the home of that relative, a paternal cousin ("Cousin"). Because Cousin was a single parent of four children, she informed the agency that she would need time to decide whether she could also incorporate C.D. and B.D. into her home. In the meantime, the juvenile court held review hearings after which the court found that Mother and Father were not complying with their case plan objectives. Father was in jail. Mother tested positive for methamphetamines, had been discharged from counseling services for non-compliance, refused to disclose her current

address, and was only visiting intermittently with the children. The magistrate found that CSB was continuing to provide reasonable reunification efforts after each review hearing.

{¶8} CSB filed sunset dispositional motions a few weeks before the one year anniversary of its filing of the complaints. The agency requested that N.D. be placed in the legal custody of Cousin, but moved for permanent custody of C.D. and B.D. Even so, the agency noted in its permanent custody motion that a kinship assessment of maternal relatives in Youngstown was underway regarding a possible placement for C.D. and B.D. The guardian ad litem filed a motion for permanent custody of all three children, notwithstanding N.D.'s placement with Cousin, based on Mother's and Father's lack of case plan compliance and N.D.'s strong desire to remain with her brothers. Cousin by that time had determined that she would be unable to also accept placement of C.D. and B.D., although she wanted to continue to have them in her home for alternative weekend visits.

{¶9} At 17 months into the case, Mother and Father filed motions for a six-month extension of temporary custody. Shortly thereafter, CSB withdrew its motion for permanent custody of C.D. and B.D. and moved for a six-month extension of temporary custody. Although the agency asserted that Mother was not engaged in case plan services, CSB alleged that Father had been released from prison, was participating in a rehabilitation program and testing negative for drugs, was consistently engaging in positive visits, and wanted to reunify with the children. After a hearing, the juvenile court found that motions for permanent custody had been withdrawn by CSB and the guardian ad litem. Noting the parties' agreement, the court granted the six-month extension of temporary custody.

{¶10} Twenty-three months into the case, CSB filed a renewed motion for permanent custody regarding C.D. and B.D. The agency's motion for legal custody of N.D. to Cousin

remained pending. Before the final sunset dispositional hearing could be held, however, CSB filed a notice of a placement change for C.D. and B.D., whom the agency had placed with another suitable relative, a paternal aunt ("Aunt"). Aunt is Father's sister and the mother of Cousin. Aunt's home was a licensed therapeutic foster home within the Ohio Mentor system. In addition, Aunt and Cousin lived close to each other, which allowed the three siblings to have almost daily contact with one another. Around the same time, Mother suffered serious physical injuries during an assault and requested a continuance of the sunset dispositional hearing. The juvenile court granted a continuance for that reason, as well as to give CSB the opportunity to assess the placement of C.D. and B.D. with Aunt.

{¶11} In the meantime, Father filed a motion for legal custody, or, alternatively, legal custody to the current relative placements of the children, i.e., Cousin and Aunt. Mother filed a motion for legal custody of the children. CSB withdrew its motion for permanent custody regarding C.D. and B.D. and moved for legal custody of those two children to Aunt. In addition, the agency's motion for legal custody of N.D. to Cousin remained pending.

{¶12} Just over two and a half years after CSB filed its original complaints, the juvenile court held the final dispositional hearing. The trial court found that it was in the best interest of N.D. to be placed in the legal custody of Cousin, and in the best interest of C.D. and B.D. to be placed in the legal custody of Aunt. Moreover, the court expressly found that it would be contrary to the best interest of the children to be returned to Mother's legal custody, based in large part on Mother's lack of case plan compliance and cooperation with the caseworker and guardian ad litem, as well as her failure to visit with the children during the previous six months. The juvenile court awarded Father visitation as he and the legal custodians might agree. In recognition, in part, of the tension between Mother and at least one of the legal custodians, Mother was granted supervised

visitation of the children at a paid visitation center at Mother's expense, "unless otherwise agreed by the parties." Both legal custodians agreed to forego child support from the parents at that time, and the court set Mother's and Father's child support obligations at $0 per month. Finally, the juvenile court found that CSB had continued to use reasonable reunification efforts. Mother filed a timely notice of appeal. She raises four assignments of error for review.

II.

## ASSIGNMENT OF ERROR I

THE TRIAL COURT'S DECISION TO DENY THE MOTHER'S MOTION FOR LEGAL CUSTODY, AND TO PLACE THE CHILDREN IN THE LEGAL CUSTODY OF NON-PARENT RELATIVES, WAS AN ABUSE OF DISCRETION AND AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶13} Mother argues that the juvenile court's judgment which placed N.D. in the legal custody of Cousin and C.D. and B.D. in the legal custody of Aunt was against the manifest weight of the evidence. This Court disagrees.

{¶14} In considering whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered." (Internal citations and quotations omitted.) *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. When weighing the evidence, this Court "must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21.

On appeal, an award of legal custody will not be reversed if the judgment is supported by a preponderance of the evidence. Preponderance of the evidence entails the greater weight of the evidence, evidence that is more probable, persuasive, and possesses greater probative value. In other words, when the best interest of the child is established by the greater weight of the evidence, the trial court does not have discretion to enter a judgment that is adverse to that interest.

(Internal citations and quotations omitted.) *In re M.F.*, 9th Dist. Lorain No. 15CA010823, 2016-Ohio-2685, ¶ 7.

{¶15} "Following an adjudication of neglect, dependency, or abuse, the juvenile court's determination of whether to place a child in the legal custody of a parent or a relative is based solely on the best interest of the child." *In re K.H.*, 9th Dist. Summit No. 27952, 2016-Ohio-1330, ¶ 12. The statutory scheme regarding an award of legal custody does not include a specific test or set of criteria, but Ohio courts agree that the juvenile court must base its decision to award legal custody on the best interest of the child. *In re B.B.*, 9th Dist. Lorain No. 15CA010880, 2016-Ohio-7994, ¶ 18, quoting *In re N.P.*, 9th Dist. Summit No. 21707, 2004-Ohio-110, ¶ 23. In that regard, the juvenile court is guided by the best interest factors enumerated in R.C. 2151.414(D) relating to permanent custody. *In re B.G.*, 9th Dist. Summit No. 24187, 2008-Ohio-5003, ¶ 9, citing *In re T.A.*, 9th Dist. Summit No. 22954, 2006-Ohio-4468, ¶ 17. Those factors include the interaction and interrelationships of the child, the child's wishes, the custodial history of the child, the child's need for permanence, and whether any of the factors in R.C. 2151.414(E)(7)-(11) are applicable. R.C. 2151.414(D)(1)(a)-(e); *see also In re B.C.*, 9th Dist. Summit Nos. 26976 and 26977, 2014-Ohio-2748, ¶ 16. In addition, the juvenile court may also look to the best interest factors in R.C. 3109.04(F)(1) for guidance. *In re K.A.*, 9th Dist. Lorain Nos. 15CA010850 and 15CA010860, 2017-Ohio-1, ¶ 17. While some factors overlap with those above, others include the child's adjustment to his or her environment; the mental and physical health of all persons involved; the parents' history of providing support and honoring companionship orders; certain indicia of violence, abuse, or neglect in any household involved; and whether a parent plans to or has established a residence outside of Ohio. R.C. 3109.04(F)(1).

{¶16} N.D., C.D., and B.D. lived with Mother and Father until they were removed from their home at their respective ages of six, three, and two years. Although the record is unclear, it appears as though either N.D. or C.D. spent time in the legal custody of their maternal grandmother, who also had legal custody of Daughter and Son. That legal custody disposition disrupted when the maternal grandmother became homeless and the children were returned to Mother under an order of protective supervision. Upon their removal from their parents' home, the children were placed in two separate foster homes. Within about six months, the agency transitioned N.D. into Cousin's home. C.D. and B.D. spent every other weekend in Cousin's home as she considered whether she could accept those additional two children into her home on a permanent basis. At that time, Cousin had four biological children and N.D. living in her home. Ultimately, Cousin determined that she could not accommodate the permanent placement of C.D. and B.D., although she wished for them to continue visiting in her home on alternate weekends. The boys remained together in a foster home for 28 months until they were placed in Aunt's home after two months of increased visits with Aunt.

{¶17} The three children are closely bonded to one another. N.D. in particular has a strong sibling bond with her younger brothers and wishes to be in close and frequent contact with them. Father spent more than a year in jail and prison during the case, but after his release, he consistently visited with the children. Those visits went well. Father behaved appropriately in a supervised setting but was less attentive than required during the few community visits he had. The children appeared to enjoy their time with Father.

{¶18} Mother visited sporadically during the case. Her frequent cancellations and no shows had an impact on N.D. in particular who would become sad and angry when Mother failed to visit when scheduled. During the last six months of the case, the children had no contact with

Mother due to Mother's failure to request visits. Although Mother reasonably did not want the children to see her facial disfigurement after she was assaulted, Mother made no effort to call the children during that time or reestablish in person visits after she had had reconstructive surgeries and time to heal.

{¶19} N.D. is comfortable in Cousin's home. The child is bonded with Cousin, her children, and her fiancé who now resides in that home. Cousin works in the school that N.D. and C.D. attend, so there is opportunity for the three to interact during the day. Both children are doing well in school where they are also engaged in counseling to help them cope with their displacement from their parents' home, as well as their exposure to domestic violence between Mother and Father, and amongst Daughter, Son, Mother, and Father. N.D. is also working with a counselor to address the trauma of witnessing a sexual assault by Son upon Daughter. N.D. is academically on track, having caught up after Mother failed to enroll her in kindergarten. C.D. and B.D., who is in preschool, are both developmentally on target.

{¶20} According to the guardian ad litem, N.D. has been inconsistent in her expressed desires regarding custody throughout the case. She never wavered, however, from her fervent desire to spend time with C.D. and B.D. The guardian ad litem reported that N.D. has said that she would like to be with Mother or Father, but that even at nine years old, the child realizes that neither parent is able to take care of her and her brothers. Because N.D. is comfortable in Cousin's home and is able to spend time with C.D. and B.D. on a nearly daily basis after their placement with Aunt, the guardian opined that it was in N.D.'s best interest to be placed in the legal custody of Cousin. Moreover, during discussions with the court on the record immediately before the hearing, N.D.'s attorney asserted that N.D. agrees to be placed in the legal custody of Cousin. C.D. and B.D. wished to live with their former foster parents, but that was not a viable option. The

guardian ad litem reported that C.D. and B.D. are too immature at six and four years old to reasonably express their desires regarding custody. She further opined that it was in the best interest of C.D. and B.D. to be placed in the legal custody of Aunt.

{¶21} After two and a half years in custodial limbo, the children deserve and require permanency. Father agreed on the record prior to the hearing to an award of legal custody of N.D. to Cousin and an award of legal custody of C.D. and B.D. to Aunt. The children had all transitioned into the proposed custodians' homes and were adjusting well. All of their basic needs were being met in Cousin's and Aunt's safe and stable homes. The children were current on all vaccinations and their dental issues had been addressed. All three children were engaged in counseling, and Cousin and Aunt testified that they would maintain the children in counseling if they became the legal custodians.

{¶22} Cousin and Aunt executed statements of understanding for legal custody. Both testified that they would facilitate visitation with the children for both parents, although Cousin and Aunt preferred that Mother's visits occur in a neutral location to avoid any confrontations between Mother and the legal custodians.

{¶23} While the evidence demonstrated that Cousin and Aunt were able and willing to provide safe and stable homes for the children, it was clear that Mother could not. Mother moved multiple times during the case, always refusing to allow the caseworker or guardian ad litem access to her various homes. Her last known residence was the Battered Women's Shelter where Mother was assaulted more than six months before the hearing. Both the caseworker and guardian ad litem had difficulties contacting Mother throughout the case due to Mother's instability. Not only did Mother repeatedly move from home to home, but she also changed phone numbers frequently.

The caseworker testified that she had eight phone numbers for Mother yet could still rarely reach her.

{¶24} In addition to unverifiable housing, Mother did not maintain consistent employment during the case. She reportedly worked on and off at various jobs but failed to provide any proof of employment except on one occasion six months prior to the hearing. The caseworker testified that Mother's current employment and housing situations were unknown based on Mother's failure to maintain contact with her.

{¶25} Mother also failed to address two significant objectives on her case plan, specifically her mental health and substance abuse issues. Early in the case, Mother obtained a dual diagnostic assessment for mental health and substance abuse at Greenleaf. She was required to participate in counseling to address those issues, including her involvement in domestically violent relationships. While Mother may have attended a couple counseling appointments, she was quickly discharged from treatment after missing multiple scheduled appointments. Greenleaf's policy prevented re-engagement for 90 days after a discharge. Although Mother was eligible to re-engage at that point, she failed to do so. A full year later, Mother obtained a second assessment at Greenleaf and was again recommended for counseling. After attending three or four appointments and then failing to appear, Greenleaf again discharged Mother for noncompliance. Despite positive drug screens, including methamphetamine and marijuana; a history of domestically abusive relationships; and diagnoses for adjustment disorder and cannabis abuse disorder, Mother told the caseworker that she did not need any services. Mother testified that she did not attend counseling sessions because her work hours conflicted with her appointment times.

{¶26} Significantly, Mother made little effort during the case to maintain contact with the children. Due to inconsistent and sporadic attendance at visits, CSB twice removed Mother from

the visitation schedule pursuant to agency policy after three consecutive missed visits. The caseworker testified that she discussed with Mother the procedure for reinstating visits. After last visiting with the children more than six months prior to the hearing, Mother failed to contact the agency to re-establish a visitation schedule. Although the guardian ad litem agreed that it was reasonable for Mother to discontinue in person visits while her extensive injuries from her assault were still healing, Mother made no effort instead to call the children despite court ordered telephone visits. In fact, at one point Mother told N.D. to stop calling her after the child was initiating frequent phone calls to Mother. As a result, the children had had no contact with Mother for a significant period of time as of the date of the hearing.

{¶27} Mother testified and disputed her non-compliance with case plan objectives or minimized her non-compliance. For example, she testified she repeatedly attempted to contact the caseworker about services, housing, and visitation but that the caseworker failed to return her calls. Mother testified that she missed visits with the children because "probably * * * [she] had to work." She claimed that she only received a copy of the most recently amended case plan two weeks before the hearing, although she admitted receiving a copy of the original case plan. Significantly, Mother's case plan objectives remained the same throughout the case. As to mental health and substance abuse counseling, Mother testified that she went to the Battered Women's Shelter, not because of domestic violence issues, but for services like housing assistance and group counseling. Although she was there for three months before leaving after she was assaulted, Mother testified that she never began any services there because she was not there long enough to do so.

{¶28} Based on a thorough review of the record, this is not the exceptional case in which the trier of fact clearly lost its way and committed a manifest miscarriage of justice by placing the

children in the legal custody of relatives. The preponderance of the evidence established that Cousin and Aunt were willing and able to provide safe and stable homes in which the children's basic needs were met. The children were comfortable in those homes and were able to see one another frequently to maintain their strong sibling bonds. Cousin and Aunt were committed to continuing the children in counseling to help them address prior traumas and adjust to their environments. Both relatives expressed a willingness to ensure that Mother and Father would have the opportunity to visit with the children. With the exception of Mother, all parties agreed that it would be in the children's best interest to be in the legal custody of Cousin and Aunt.

{¶29} As to Mother, the preponderance of the credible evidence demonstrated that she was not able to provide a safe and stable home for the children. In two and a half years, Mother had not attained stable housing or verifiably consistent income. She failed to engage in any meaningful way in mental health or substance abuse services, despite ongoing issues in both areas. Under the circumstances, the juvenile court's findings that awards of legal custody of N.D. to Cousin and legal custody of C.D. and B.D. to Aunt are not against the manifest weight of the evidence. Mother's first assignment of error is overruled.

**ASSIGNMENT OF ERROR II**

THE TRIAL COURT ERRED AS A MATTER OF LAW, AND PREJUDICED THE MOTHER'S DUE PROCESS RIGHTS, IN GRANTING LEGAL CUSTODY OF THE CHILDREN TO NON-PARENTS WHEN [CSB] DID NOT USE REASONABLE EFFORTS TO PREVENT THE REMOVAL OF THE CHILDREN FROM THE HOME, AND AFTER THEIR REMOVAL, DID NOT USE REASONABLE EFFORTS TO REUNIFY THE CHILDREN WITH THEIR MOTHER.

{¶30} Mother argues that CSB failed to use statutorily mandated reasonable reunification efforts throughout the case below. This Court disagrees.

{¶31} Pursuant to R.C. 2151.419(A)(1), a child welfare agency must use "reasonable efforts to prevent the removal of the child[ren] from the child[ren]'s home, to eliminate the continued removal of the child[ren] from the child[ren]'s home, or to make it possible for the child[ren] to return safely home." In addition, "[i]n determining whether reasonable efforts were made, the child[ren]'s health and safety shall be paramount." *Id.* Because R.C. Chapter 2151 does not define "reasonable efforts," courts have construed that term to mean "'[t]he state's efforts to resolve the threat to the child[ren] before removing the child[ren] or to permit the child[ren] to return home after the threat is removed[.]'" *In re T.B.-W.*, 9th Dist. Summit No. 27544, 2015-Ohio-992, ¶ 15, quoting *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, ¶ 28, quoting Will L. Crossley, *Defining Reasonable Efforts: Demystifying the State's Burden Under Federal Child Protection Legislation*, 12 B.U.Pub.Int.L.J. 259, 260 (2003). "In a reasonable efforts determination, the issue is not whether the agency could have done more, but whether it did enough to satisfy the reasonableness standard under the statute." *In re C.M.*, 9th Dist. Summit No. 24380, 2009-Ohio-943, ¶ 21.

{¶32} Throughout the case below, the juvenile court found that CSB had used the statutorily required reasonable efforts, beginning at the shelter care hearing, after multiple review hearings, and continuing through the final sunset dispositional hearing. The reasonable efforts cited by the trial court included the agency's numerous attempts to contact the family, obtaining an order of access to the home to check on the welfare of the children, conducting an initial home visit with the assistance of the police, providing protective supervision, preparing and amending the case plan, making referrals for services, procuring releases of information from service providers, meeting and attempting to have contact with Mother and Father, arranging visitation at the Family Interaction Center, providing bus passes to the parents when necessary, identifying and

investigating relatives for placement, assisting in the children's transitions into foster and kinship homes, and providing general case management services.

{¶33} Mother never filed objections or motions to set aside any magistrate's decisions or orders to challenge these findings. She did not argue at the final dispositional hearing that CSB had failed to use reasonable reunification efforts. In the absence of transcripts of any prior hearings, this Court must presume regularity in the juvenile court's reasonable efforts determinations. *See K.C.*, 9th Dist. Summit Nos. 30057 and 30058, 2022-Ohio-113, ¶ 11. In addition, the evidence supports the finding in the final judgment that CSB developed a case plan for the purpose of reunifying the children with Mother and that the agency facilitated services and visitation for Mother in furtherance of that goal. Mother signed the original case plan, received a copy, and was aware of the issues she was required to address. She failed, however, to take advantage of the services offered, including engaging in counseling services and visitation. Mother cannot construe her failure to address her case plan objectives as deficiencies by CSB to provide reunification efforts, and this Court likewise declines to do so. *See In re D.B.*, 9th Dist. Lorain No. 05CA008794, 2006-Ohio-522, ¶ 17 (noting the agency's and parents' corresponding obligations under the case plan and concluding that parents "cannot sit idly by * * *, refusing to participate, and then fairly claim that the agency has failed [them]."). Mother's second assignment of error is overruled.

## ASSIGNMENT OF ERROR III

THE TRIAL COURT ERRED AS A MATTER OF LAW, AND PREJUDICED THE MOTHER'S DUE PROCESS RIGHTS, WHEN IT GRANTED LEGAL CUSTODY TO RELATIVES OF THE CHILDREN'S FATHER DESPITE [CSB'S] REFUSAL TO EVALUATE PROPOSED KINSHIP CUSTODIANS ON THE MOTHER'S SIDE.

**{¶34}** Mother argues that the juvenile court erred by granting legal custody of the children to paternal relatives without investigating the maternal relatives proposed by Mother. This Court disagrees.

**{¶35}** This Court reiterates that "the juvenile court derives its sole authority in dependency, neglect, and abuse cases from the comprehensive statutory scheme set out in R.C. Chapter 2151." *In re B.H.*, 9th Dist. Summit Nos. 29998 and 29999, 2021-Ohio-4152, ¶ 25. Moreover, the director of job and family services has been authorized to adopt rules to guide public child welfare agencies regarding matters including, but not limited to, administrative requirements; case plan creation, implementation, and management; foster care; and the placement of children within an agency's custody. *See id*. Those rules are found within various provisions of the Ohio Administrative Code.

**{¶36}** Mother argues that CSB's alleged failure to investigate maternal relatives for placement violated its obligation to use reasonable efforts to finalize a permanency plan as required by R.C. 2151.417(K)(3)(a), and therefore precluded the juvenile court from awarding legal custody to Cousin and Aunt. Specifically, Mother asserts that those reasonable efforts include "locating appropriate relatives who could take custody of the children." This statutory provision, however, does not include any reference to locating relative placements. Accordingly, it offers no support for Mother's argument.

{¶37}  Mother next argues that CSB violated a statutory scheme which became effective less than one month before the sunset dispositional hearing, and after the case had been pending for two and a half years, when it allegedly failed to investigate maternal relatives for placement. R.C. 2151.4116, which became effective on September 30, 2021, requires the agency to "make intensive efforts to identify and engage an appropriate and willing kinship caregiver for the care of a child who is in * * * [t]emporary custody of the agency[.]"  R.C. 2151.4116(A).  R.C. 2151.4115(A)(1) defines "kinship caregiver" as that term is defined in R.C. 5101.85, and includes, among others, persons related by blood or adoption (e.g., grandparents, siblings, aunts, uncles, and cousins), and others such as stepparents, legal custodians or guardians, and "[a]ny nonrelative adult that has a familiar and long-standing relationship or bond with the child or the family, which relationship or bond will ensure the child's social ties."

{¶38}  R.C. 2151.4117 requires the juvenile court to determine at every hearing whether the agency has continued to use the requisite efforts.  Nevertheless, R.C. 2151.4118 provides that the juvenile court may relieve the agency of continued intensive efforts to locate an appropriate kinship caregiver if it finds that continuing the child's current placement with non-kin is in the best interest of the child and that continued intensive efforts are unnecessary based on the requisite findings in R.C. 2151.4119.  Under that provision, the juvenile court must find that the child has been living in a stable home environment with the current caregiver for the past twelve months, the current caregiver has expressed an interest in providing permanency for the child, and removing the child from that placement would be detrimental to the child's emotional well-being. R.C. 2151.4119(A)-(C).  If the juvenile court makes the R.C. 2151.4118 finding relieving the agency of continued intensive efforts to locate an appropriate kinship caregiver, it is significant that this new statutory scheme allows the juvenile court and agency to "consider the child's current

caregiver as having a kin relationship with the child *and at an equal standing to other kin in regards to permanency*." (Emphasis added.) R.C. 2151.4120.

{¶39} Given the timing of the enactment of this new statutory scheme, CSB and the juvenile court could not have realistically applied these provisions during the pendency of the case below. Even so, CSB in fact identified and engaged appropriate and willing kinship caregivers for these children. There is no requirement to prioritize any category of kinship caregiver over another. In fact, R.C. 2151.4120 appears to place appropriate and willing kin on equal footing with one another. Under those circumstances, once the agency has identified and placed a child in an appropriate kinship home, the agency has met its obligation. The interest of permanence for children, coupled with the reality that an agency's financial resources are not limitless, further support the conclusion that a child welfare agency has no duty to continue to investigate additional possible kinship caregivers when it has already identified and engaged an appropriate and willing one for a child.

{¶40} Ohio Adm.Code 5101:2-42-05(A) directs the agency to "explore both maternal and paternal relatives * * * regarding their willingness and ability to assume temporary custody or guardianship of the child." Even so, subsection (E) provides, in relevant part:

> When [the agency] has temporary custody of a child, it shall select a substitute care setting that is consistent with the best interest and special needs of the child and that meets the following criteria:
>
> (1) Is considered the least restrictive, most family-like setting available to meet the child's emotional and physical needs.
>
> * * *
>
> (4) Is designed to enhance the likelihood of achieving permanency plan goals.

Subsection (F) lists substitute care settings from least to most restrictive. After placement with a parent in a substance abuse disorder residential facility, the "home of a suitable relative" is the

least restrictive placement. Ohio Adm.Code 5101:2-42-05(F)(2). For purposes of this provision, "relative" includes aunts and cousins. Ohio Adm.Code 5101:2-1-01(B)(264).

{¶41} In this case, by placing the children with Cousin and Aunt, CSB chose least restrictive, family-like care settings which were designed to enhance the likelihood of permanency in the event that reunification with the parents was not feasible. It, therefore, complied with its placement consideration duty. Nevertheless, CSB in fact did not ignore Mother's requests that the agency consider maternal relatives as placement options. For example, the agency's first motion for permanent custody regarding C.D. and B.D. asserted that a kinship assessment of maternal relatives in Youngstown was underway. According to a report by the guardian ad litem, Mother and those relatives had a disagreement and Mother was forced to move out of that home.

{¶42} Mother next asked CSB to consider the maternal grandmother and Son as placement options. The agency did not reassess the maternal grandmother, not only because she had previously lost placement of Daughter, Son, and one of the subject children when she became homeless, but also because Mother had expressed concerns to the caseworker regarding the maternal grandmother's live-in boyfriend. The caseworker testified that the agency declined to fully assess Son as a placement option because he had just turned 18 years old, lived in a home that was too small to accommodate the children, and because Mother had admitted to the caseworker that Son was "developmentally delayed."

{¶43} For the reasons set forth above, this Court cannot conclude that CSB violated any duty by failing to investigate any maternal relatives suggested by Mother as placement options for the children. The agency identified and assessed the least restrictive placement options available. It approved two family members who were appropriate and willing to accept placement of the children. Moreover, the agency in fact did not disregard Mother's requests to consider certain

maternal relatives. However, concerns both known to the agency and raised by Mother regarding those maternal relatives reasonably justified CSB's declination to use additional resources to conduct full investigations, where other suitable relatives had already been identified. Mother's third assignment of error is overruled.

**ASSIGNMENT OF ERROR IV**

THE TRIAL COURT ERRED IN REQUIRING [MOTHER] TO HAVE PAID, SUPERVISED VISITATION.

**{¶44}** Mother argues that the juvenile court erred by limiting Mother's visitation with the children to supervised visits at a commercial center at Mother's expense. This Court disagrees.

**{¶45}** The juvenile court has discretion in determining an award of parental visitation, and this Court will not reverse that award unless the juvenile court has abused its discretion. *In re K.D.*, 9th Dist. Summit No. 28459, 2017-Ohio-4161, ¶ 26. A trial court abuses its discretion when its judgment is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). When reviewing a ruling for an abuse of discretion, this Court is precluded from substituting our judgment for that of the trial court. *Pons v. Ohio State Med. Bd.*, 66 Ohio St.3d 619, 621 (1993).

**{¶46}** As an initial matter, the juvenile court did not restrict Mother's visits to a paid visitation center. It ordered that Mother's visits "may" occur in such a setting, "unless otherwise agreed by the parties." Accordingly, Mother and the legal custodians remain free to establish alternative visitation opportunities as Mother, Aunt, and Cousin might agree.

**{¶47}** Moreover, this Court cannot conclude that the juvenile court abused its discretion by proposing visitation for Mother in a paid center at Mother's expense. The evidence demonstrated that Mother continued to struggle with untreated substance abuse and mental health issues and that she exhibited some aggressive tendencies. There was tension between Mother and

Cousin, particularly within the context of Mother's visitation with the children. Of significant concern was Mother's inconsistency in appearing for visits, and her complete failure to pursue any contact with the children during the last six months of the case. The evidence demonstrated that the children were deeply saddened by Mother's cancellations and failures to arrive for visits. Accordingly, it is reasonable to believe that requiring Mother to pay for visitation times at a commercial center would increase the likelihood that Mother would actually appear and take advantage of the time for which she had paid. Mother does not argue that she cannot afford to pay any visitation fees. Moreover, her $0 child support order makes it more likely that she would have the funds for visits. Under the circumstances, Mother's visitation order was reasonable and, therefore, evidenced sound discretion by the juvenile court. Mother's fourth assignment of error is overruled.

## III.

{¶48} Mother's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

––––––

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period

for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

LYNNE S. CALLAHAN
FOR THE COURT

HENSAL, P. J.
SUTTON, J.
CONCUR.

APPEARANCES:

DAVID BELFIGLIO, Attorney at Law, for Appellant.

MARK SWEENEY, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and JACQUENETTE S. CORGAN, Assistant Prosecuting Attorney, for Appellee.

JOSEPH KERNAN, Guardian ad Litem.

RYAN KINNEY, Attorney at Law, for the minor child.