[Cite as *In re J.E.*, 2022-Ohio-2403.]

STATE OF OHIO )  
                     )ss:  
COUNTY OF SUMMIT )

IN THE COURT OF APPEALS  
NINTH JUDICIAL DISTRICT

IN RE: J.E.

C.A. No.      30174

APPEAL FROM JUDGMENT  
ENTERED IN THE  
COURT OF COMMON PLEAS  
COUNTY OF SUMMIT, OHIO  
CASE No.      DN 20 11 0753

DECISION AND JOURNAL ENTRY

Dated: July 13, 2022

CALLAHAN, Judge.

**{¶1}** Appellant Father appeals the judgment of the Summit County Court of Common Pleas, Juvenile Division, that granted legal custody of his child to the child's maternal grandmother ("Grandmother"). This Court affirms.

I.

**{¶2}** Mother and Father are the biological parents of J.E., born July 10, 2014. The child was born with chromosomal anomalies which resulted in, among other things, developmental delays and significant behavioral issues. In 2017, Summit County Children Services Board ("CSB" or "the agency") filed a dependency complaint involving the child.[1] As a result of those proceedings, J.E. was placed in the legal custody of Grandmother in 2018. Near the end of 2020, Grandmother contacted CSB because she had exhausted all respite funding available to her from

---

[1] It appears from the record that J.E.'s two older siblings were also subject children in complaints filed by CSB and ultimately placed in the legal custody of Grandmother.

Summit County Board of Developmental Disabilities ("Summit DD"), and she was overwhelmed by the child's violent behaviors and struggling to provide the necessary care and supervision to maintain J.E. in her home. Pursuant to an agreement among CSB, Summit DD, and Grandmother, the agency removed the child from Grandmother's home and filed a complaint alleging the child's dependency. In addition to noting the legal custodian's, i.e., Grandmother's, difficulties in maintaining J.E. in her home, CSB alleged that Mother suffers from physical and mental health issues; and that Father has a significant history of, and ongoing issues with, domestic violence and alcohol abuse. The agency referenced an incident earlier in the year for which Father was charged with child endangering after the child was found naked and bleeding from the nose while in Father's care, while Father was passed out drunk. After the shelter care hearing, the magistrate placed J.E. in the agency's emergency temporary custody and found that CSB had used reasonable efforts to prevent the child's removal from her home.

{¶3} The magistrate held an adjudicatory hearing, at which only Father contested the child's dependency. The court found J.E. to be a dependent child and that CSB had used reasonable efforts to prevent the child's continued removal from her home. Father did not object to the magistrate's decision, and the juvenile court adopted it.

{¶4} Father moved for increased visitation, or alternatively, temporary custody or legal custody. After the initial dispositional hearing, the magistrate ordered that the child be placed in the temporary custody of CSB. Because the agency was considering increasing Father's visitation and reducing the supervision level, the court denied Father's motions regarding visitation and custody. The magistrate again found that CSB had used reasonable reunification efforts and further adopted the agency's case plan as an order.

**{¶5}** Father filed objections to the magistrate's decision, but not before CSB filed a motion to modify its temporary custody to legal custody to Grandmother under the agency's protective supervision and for an expedited hearing. The agency asserted that a bed for the child had become available at an Intermediate Care Facility for persons with developmental disabilities ("ICF/DD"), the placement had to be accepted within the next couple of weeks or it would be committed to someone else, and the child must be in the legal custody of a person rather than an agency to effectuate the placement. At the hearing on the motion, all parties agreed to an order of temporary custody to Grandmother under the agency's protective supervision to facilitate the child's placement in the ICF/DD known as Rosemary House.[2] Thereafter, the juvenile court overruled Father's objection to the initial disposition as moot given his agreement that J.E. would be placed in Grandmother's temporary custody for purposes of placement in the ICF/DD.

**{¶6}** CSB's case plan, which the juvenile court adopted, contained numerous objectives for Father in furtherance of the goal of reunification. He was required to: (1) obtain a chemical dependency assessment, follow all recommendations, and submit to random drug and alcohol screening; (2) submit to a parenting evaluation at a mental health agency to determine his mental status, personality functioning, and parenting skills, and follow all recommendations; (3) complete anger management classes, and demonstrate the ability to cope with stressors without resorting to physical or verbal aggression; (4) obey all laws, avoid additional criminal charges, and comply with all rules of probation; (5) maintain a safe and clean home for the child, give the

---

[2] Rosemary House agreed to accept J.E. for a preliminary placement even though Grandmother would only initially be the child's temporary custodian, rather than her legal custodian.

caseworker access to verify the home conditions and working utilities, and maintain a verifiable source of income to meet all basic needs; and (6) sign all necessary releases of information to CSB, including for all service providers and criminal probation departments.

{¶7} After Grandmother obtained temporary custody of the child, the agency modified the case plan to add objectives for Grandmother. She was required to (1) work with the ICF/DD staff to ensure that J.E.'s needs were being met, (2) enroll the child in school, (3) stay current on the child's medical and educational needs by attending all appointments and meetings, (4) maintain regular contact with CSB to update the agency regarding any changes in the child's care, and (5) sign all necessary releases of information to allow communications between CSB and the ICF/DD. The amended case plan noted that Grandmother and Father jointly developed the case plan with CSB and agreed to its contents.

{¶8} Not long after J.E.'s placement at Rosemary House, CSB filed a notice with the juvenile court, informing the court and all parties that the ICF/DD was discharging the child within the next three weeks "due to ongoing threatening communication from Father to the facility." The agency appended a copy of the letter Rosemary House sent to Grandmother and copied to CSB and Summit DD. The letter indicated that Rosemary House was unable to continue to provide services to J.E. due to safety concerns for the child, other residents, and staff at the ICF/DD arising from threats by Father. In addition, CSB moved for a no contact order to prevent Father from having any further contact with the ICF/DD based on his threats to that facility. The juvenile court granted the no contact order.

{¶9} J.E. was placed in another ICF/DD, the identity of which was not disclosed to Father. CSB filed a motion for legal custody to Grandmother so that she could continue to facilitate the child's placement in her new ICF/DD where she was doing well. After a final dispositional

hearing, the juvenile court granted the agency's motion, awarded legal custody to Grandmother, and ordered that J.E. would remain in her current ICF/DD placement. The judgment provided that Father would have supervised visits for a limited time as he and Grandmother would schedule. If Father demonstrated a sustained period of sobriety and resolved his remaining criminal cases, he could have unsupervised visits the J.E., with the "[f]requency and duration to be set in the best interests of [the child]." Father filed a timely appeal and raises two assignments of error for review.

II.

**ASSIGNMENT OF ERROR I**

THE TRIAL COURT COMMITTED AN ABUSE OF DISCRETION IN GRANTING [CSB'S] MOTION FOR LEGAL CUSTODY TO A RELATIVE.

**{¶10}** Father argues that the juvenile court erred by granting legal custody of J.E. to Grandmother. This Court disagrees.

On appeal, an award of legal custody will not be reversed if the judgment is supported by a preponderance of the evidence. Preponderance of the evidence entails the greater weight of the evidence, evidence that is more probable, persuasive, and possesses greater probative value. In other words, when the best interest of the child is established by the greater weight of the evidence, the trial court does not have discretion to enter a judgment that is adverse to that interest. Thus, our standard of review is whether a legal custody decision is against the manifest weight of the evidence.

(Internal citations and quotations omitted.) *In re M.F.*, 9th Dist. Lorain No. 15CA010823, 2016-Ohio-2685, ¶ 7.

**{¶11}** In considering whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered." (Internal quotations omitted.) *Eastley v. Volkman*,

132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. When weighing the evidence, this Court "must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21.

{¶12} "Following an adjudication of neglect, dependency, or abuse, the juvenile court's determination of whether to place a child in the legal custody of a parent or a relative is based solely on the best interest of the child." *In re K.H.*, 9th Dist. Summit No. 27952, 2016-Ohio-1330, ¶ 12. The statutory scheme regarding an award of legal custody does not include a specific test or set of criteria, but Ohio courts agree that the juvenile court must base its decision to award legal custody on the best interest of the child. *In re B.B.*, 9th Dist. Lorain No. 15CA010880, 2016-Ohio-7994, ¶ 18, quoting *In re N.P.*, 9th Dist. Summit No. 21707, 2004-Ohio-110, ¶ 23. In that regard, the juvenile court is guided by the best interest factors enunciated in R.C. 2151.414(D) relating to permanent custody. *In re B.G.*, 9th Dist. Summit No. 24187, 2008-Ohio-5003, ¶ 9, citing *In re T.A.*, 9th Dist. Summit No. 22954, 2006-Ohio-4468, ¶ 17. Those factors include the interaction and interrelationships of the child, the child's wishes, the custodial history of the child, the child's need for permanence, and whether any of the factors in R.C. 2151.414(E)(7)-(11) are applicable. R.C. 2151.414(D)(1)(a)-(e); *see also In re B.C.*, 9th Dist. Summit Nos. 26976 and 26977, 2014-Ohio-2748, ¶ 16.

{¶13} In addition, the juvenile court may also look to the best interest factors in R.C. 3109.04(F)(1) for guidance. *In re K.A.*, 9th Dist. Lorain Nos. 15CA010850 and 15CA010860, 2017-Ohio-1, ¶ 17. While some factors overlap with those above, others include the child's adjustment to his or her environment; the mental and physical health of all persons involved; the parents' history of providing support and honoring companionship orders; certain indicia of violence, abuse, or neglect in any household involved; and whether a parent plans to or has established a residence outside of Ohio. R.C. 3109.04(F)(1).

{¶14} Even before first obtaining legal custody of J.E. when she was three years old, Grandmother provided the bulk of the child's care from birth. Mother has physical and mental health issues which limited, and continue to limit, her ability to provide for the child's needs. Father experienced a pattern of incarceration and suffered from alcohol abuse which prevented him from providing a safe and stable home for J.E. The child remained in Grandmother's legal custody for about three years before CSB initiated this case on Grandmother's request.

{¶15} J.E. suffers from a chromosomal disorder and multiple diagnoses not fully explained below. However, the evidence established that the child has significant developmental delays; a low tolerance threshold; a tendency towards physical aggression to herself, others, and property; and difficulties sleeping throughout the night, all of which necessitate around-the-clock supervision. Even at the age of seven years old, J.E. has extremely limited verbal communication skills, often merely mimicking isolated words spoken to her. The child is prone to removing all her clothes. She still struggles with potty training and soiling herself.

{¶16} Grandmother easily provided for the child's basic needs. She met the child's special needs with the assistance of respite services from Summit DD. When the limited monies for those services was exhausted, it became overwhelming to provide the unending supervision the child's conditions required. Instead of simply abandoning her role as the child's caregiver, however, Grandmother sought alternative avenues of providing a safe and stable environment for J.E.

{¶17} With the support and approval of various service agencies, Grandmother sought to place the child in an ICF/DD where she would enjoy the necessary care and supervision to keep her safe, while still allowing family input, participation in care, and regular visitation. After the child sustained an unexplained black eye at Rosemary House, Grandmother worked with the

ICF/DD and CSB to attempt to determine what happened. Father, on the other hand, immediately began calling the ICF/DD, threatening the staff with physical harm. Because Father's threats raised concerns for the safety of the child, other residents, and staff, Rosemary House notified Grandmother, CSB, and Summit DD of its intent to discharge J.E.

{¶18} Shortly thereafter, another ICF/DD was identified which could provide care and supervision for J.E. in a home-like setting. The child assimilated into that environment where she is thriving. She has made friends with other children in the home and has a particularly good relationship with staff who have remained consistent.[3] Grandmother enrolled the child in school where she receives additional services pursuant to an Individualized Education Program. J.E. enjoys overnight weekend visits with Grandmother who includes Mother and the child's two siblings in the visits. The child enjoys her visits but also looks forward to returning to the ICF/DD where she is very comfortable. Since her placement in her current ICF/DD, J.E.'s behavioral issues have improved. She is learning skills to assist her in daily life. Her current placement is designed for long-term care and includes multiple home environments which are designed to meet a resident's needs as she ages.

---

[3] Evidence indicated that many home care facilities experience frequent staff turnover. The child's current ICF/DD, however, historically has avoided such turnovers and has been able to provide greater consistency for its residents.

{¶19} Father has been able to visit with the child on a few occasions. Covid-19 exposures and infections have precluded some of his visits through no fault of Father. Father has behaved appropriately during his visits with the child in the community, and J.E. enjoys her time with Father.

{¶20} Father expressed a lack of understanding regarding the child's need for specialized care and supervision, however. While he acknowledged that J.E. has a chromosomal condition, he was not very familiar with the child's delays and other issues. He indicated that he believed that they were merely temporary, although he did not clarify whether he believed the child would grow out of them or whether they could be remedied via interventions. In any event, Father testified that he was not comfortable with the child living in an environment where other children had developmental delays and required special care because he feared that J.E. would only mimic their behaviors and development. Father used an epithet to describe the other developmentally delayed children in the facility, and also expressed a concern that J.E. would be exposed to children in wheelchairs.

{¶21} Although Father asserted that he wanted the child to live with him and that he could provide for her needs, the evidence demonstrated that an award of legal custody to Father would not be in the child's best interest. Father minimalized the child's special needs. He described J.E. as "not that special quote unquote." He caused the disruption of the child's placement in her first ICF/DD and called it the "[b]est move [he] ever made * * *." Although he attempted to justify his threatening behavior toward Rosemary House by explaining that the child's discharge resulted in her placement in a much better facility, Father maintained that he did not approve of the child's placement in any care facility.

**{¶22}** Father clearly demonstrated a strong love for J.E. While he may well be committed to providing for the child's care, needs, and development, he continued to face extraneous interference with his ability to ensure that J.E. would enjoy stability and the opportunity to address her ongoing issues. Father has an extensive criminal history and was on probation at the time of the hearing. He admitted that he was under a 30-month suspended prison sentence which could be imposed for violations. He continued to wear a SCRAM bracelet to monitor his alcohol use due to a probation violation in a domestic violence case in which Mother was the victim. He had just been released from house arrest for one charge of operating a vehicle under the influence ("OVI") and admitted that he had another such charge pending, his third OVI in the past year. In addition, Father was awaiting trial on a charge of cruelty to a companion animal. Both the caseworker and guardian ad litem testified that Father had a history of incarcerations for criminal acts, fulfilling terms of probation or parole, reengaging in criminal behavior, and being recommitted to further sentences of incarceration.

**{¶23}** Father claimed that he had nothing to do to complete his case plan objectives because he had already fulfilled them before the case plan was adopted. For example, Father asserted that he had completed a chemical dependency assessment and intensive outpatient treatment, parenting classes, and anger management. Nevertheless, he was charged with three separate counts of OVI in various jurisdictions in the past year, he "guesstimated" his erroneous sobriety date, he failed to demonstrate an understanding of the child's special needs so that he could accommodate those, and he had to be cautioned by the judge multiple times during the hearing to control himself. Although Father was required to obtain a parenting evaluation, he failed to comply based on his internet searches of articles which advised parents to refuse parenting evaluations by all means.

{¶24} While Father demonstrated either a lack of understanding regarding the child's needs or an unwillingness to utilize the services necessary to provide adequate care and structure for J.E., Grandmother did not. Grandmother testified as to her commitment to ensuring that the child would receive the services, education, and care necessary to allow her to thrive and develop skills to enhance her life. Grandmother understood the life-long limitations that J.E. would experience and she was cooperating with the professionals who were working to help the child function and thrive despite those limitations. Grandmother maintained frequent contact with the ICF/DD staff and the child. She picked the child up for visits and facilitated the child's visits with Mother and her siblings. Grandmother indicated a willingness to facilitate Father's visits with the child, even agreeing to forego every other weekend to allow Father to spend that time with J.E. Grandmother testified that the ICF/DD does not limit family visits, so that Father, who lives close to the ICF/DD, could see the child during the week after school, in addition to weekends. Staff at the ICF/DD had indicated a willingness to transport the child for visits with Father. Grandmother testified that she believes that it is in the best interest of J.E. to see Father, as the child enjoys those times and is bonded with Father.

{¶25} Upon hearing Grandmother's proposal for liberal visitation between him and the child, Father interrupted the proceedings and was admonished by the judge. During his testimony, Father asserted that Grandmother's proposal for every-other-weekend visitation was "unacceptable" because he questioned how he could impact the child's life in that limited time. When the caseworker and guardian ad litem recommended that Father's visits should continue to be supervised until he demonstrated that he could maintain his sobriety, he responded that he might just "wash [his] hands of the whole situation" and "back all the way out" of the child's life instead of accepting any temporary restrictions on his access to the child.

{¶26} J.E.'s living environment must be subject to accountability. The child is predominantly nonverbal and unable to report unsafe conditions or instances of abuse or neglect. She is not competent to express her wishes as to custody. However, she demonstrates that she is comfortable at her current ICF/DD and enjoys returning there after family visits. The ICF/DD offered Grandmother transparent access to its facility and welcomes ongoing family involvement. The guardian ad litem opined that it is in J.E.'s best interest to be placed in Grandmother's legal custody as Grandmother is committed to maintaining the child in the ICF/DD where she can receive the services she needs for her safety and well-being. Placement in the ICF/DD is contingent upon the child being in the legal custody of a person, rather than an agency like CSB. Father is not committed to ensuring that J.E. receives ongoing services and supervision, as he believes the child's issues are neither serious nor permanent.

{¶27} Based on a thorough review of the record, this is not the exceptional case in which the trier of fact clearly lost its way and created a manifest miscarriage of justice by awarding legal custody to Grandmother. Grandmother remains as committed now to the child's well-being as she has been throughout the child's entire life. The child's delays and other issues require consistent care and supervision which can best be provided in a home-like care facility with trained professionals who acknowledge and respond to the child's needs. Father rejects the idea that J.E. requires such care and supervision. Moreover, Father remains under the supervision of at least one criminal court and has multiple additional pending charges to resolve. Accordingly, his ongoing ability to provide in-person care for the child is unknown. Under the circumstances, the juvenile court's finding that an award of legal custody to Grandmother and ongoing placement at the current ICF/DD is in J.E.'s best interest is not against the manifest weight of the evidence. Father's first assignment of error is overruled.

**ASSIGNMENT OF ERROR II**

THE TRIAL COURT COMMITTED REVERS[I]BLE ERROR [WHEN] IT FOUND THAT [CSB] USED REASONABLE EFFORTS TO PREVENT THE CONTINUED REMOVAL OF THE CHILD FROM [FATHER].

{¶28} Father argues that the juvenile court erred by awarding legal custody to Grandmother because CSB failed to use reasonable efforts to reunify J.E with Father. This Court disagrees.

{¶29} Pursuant to R.C. 2151.419(A)(1), a child welfare agency must use "reasonable efforts to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home." In addition, "[i]n determining whether reasonable efforts were made, the child's health and safety shall be paramount." *Id.* Because R.C. Chapter 2151 does not define "reasonable efforts," courts have construed that term to mean "'[t]he state's efforts to resolve the threat to the child before removing the child or to permit the child to return home after the threat is removed[.]'" *In re T.B.-W.*, 9th Dist. Summit No. 27544, 2015-Ohio-992, ¶ 15, quoting *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, ¶ 28, quoting Will L. Crossley, *Defining Reasonable Efforts: Demystifying the State's Burden Under Federal Child Protection Legislation*, 12 B.U.Pub.Int.L.J. 259, 260 (2003). "In a reasonable efforts determination, the issue is not whether the agency could have done more, but whether it did enough to satisfy the reasonableness standard under the statute." *In re C.M.*, 9th Dist. Summit No. 24380, 2009-Ohio-943, ¶ 21.

{¶30} The juvenile court found that CSB had used reasonable reunification efforts throughout the case below. Father never challenged any of those findings. Despite objecting on evidentiary grounds to the initial dispositional order placing the child in the temporary custody of CSB, Father agreed shortly thereafter that J.E. would be placed in Grandmother's temporary

custody to facilitate her placement in an ICF/DD. Father gave no indication below that he believed that CSB was not complying with its statutory duty to help the parties resolve the threat that precipitated the child's removal from her home.

**{¶31}** CSB developed a case plan with multiple objectives for Father. He worked with the agency to create those objectives. Father had eight months to work on his case plan objectives and demonstrate his understanding of the child's special needs and his ability to meet them. The agency made appropriate referrals for services and facilitated visitation for Father. It is undisputed that Father engaged in some required services and that his visits with J.E. were appropriate. Under electronic monitoring imposed by the criminal court, he was able to achieve sobriety for almost five months by the time of the hearing. On the other hand, Father refused to engage in a required parenting evaluation which might identify issues in need of resolution. Moreover, despite his engagement in some services, he lacked the necessary insight regarding the level of care and supervision J.E. required to keep her safe and help her develop certain life skills. Most significantly, Father demonstrated the inability to avoid additional involvement with the criminal justice system. From the beginning, CSB provided reasonable reunification efforts with the health and safety of the child in mind. Father's disagreement with those efforts at this time, coupled with his failure to embrace his corresponding duty to participate in a meaningful way in services, do not impugn CSB's reasonable reunification efforts. *See In re B.D.*, 9th Dist. Summit Nos. 30194, 30195, and 30196, 2022-Ohio-1832, ¶ 33. Moreover, JE was in fact reunified with her prior legal custodian who is coordinating the necessary care for the child. Father's second assignment of error is overruled.

III.

{¶32} Father's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

————

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

LYNNE S. CALLAHAN
FOR THE COURT

HENSAL, P. J.
SUTTON, J.
CONCUR.

APPEARANCES:

ANTHONY COSTELLO, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and JACQUENETTE S. CORGAN, Assistant Prosecuting Attorney, for Appellee.

L. A., pro se, Appellee.

J. D., Mother.

ANGELINA GINGO, Guardian ad Litem.