**[Cite as *In re J.B.*, 2022-Ohio-4491.]**

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

IN RE: J.B.

C.A. No.    30130

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.    DN 18-09-882

DECISION AND JOURNAL ENTRY

Dated: December 14, 2022

SUTTON, Judge.

**{¶1}** Appellants G.M and E.M. appeal the judgment of the Summit County Court of Common Pleas, Juvenile Division, that denied their motion for legal custody of their former foster child and returned the child to the legal custody of Mother. This Court affirms.

I.

**{¶2}** Mother and Father are the biological parents of J.B., born September 5, 2018, although paternity was not established until the child was a year old. When the child was two days old, Summit County Children Services Board ("CSB" or "the agency") filed a complaint alleging that he was a dependent child based on Mother's admitted use of methamphetamine and lack of housing. The agency obtained an emergency order of temporary custody and placed J.B. with G.M. and E.M. ("Foster Mother", "Foster Father", collectively "Foster Parents"). Over the next three months, J.B was adjudicated dependent, placed in the temporary custody of CSB, and maintained in Foster Parents' home. Immediately thereafter, CSB filed a notice informing the

juvenile court that it had placed J.B. in the home of a suitable relative, specifically the child's maternal uncle ("Uncle").  Uncle's fiancée also lived in that home.[1]

{¶3}    Within six months of filing its complaint, CSB filed a motion for legal custody to relatives, to wit: Uncle and Aunt.  The guardian ad litem supported the agency's motion.  Uncle and Aunt executed and filed the statutorily required statements of understanding for legal custody.  After a hearing, the juvenile court granted legal custody to Uncle and Aunt, ordered that Mother receive a minimum of one hour per week of supervised visitation, and docketed the case closed subject to its statutory continuing jurisdiction.  The entire case was resolved in eight months.

{¶4}    Near the child's first birthday, Father filed results of genetic testing that established his paternity.  Almost eight months later, Foster Parents filed a motion for legal custody of J.B. While not asserting a change in circumstances, the motion alleged that Uncle and Aunt, the child's then legal custodians, agreed that a modification of legal custody to Foster Parents was in the child's best interest.  Foster Parents later moved to intervene and asserted that they had jointly cared for the child with Uncle and Aunt since his placement with those relatives.  A magistrate heard the motion.

{¶5}    After learning during the hearing that J.B. had never resided in the home of Uncle and Aunt as the court ordered, but had rather remained in Foster Parents' home pursuant to a scheme between the two couples and unbeknownst to either the agency caseworker or Mother, the magistrate ordered the vacation of the prior order granting legal custody to Uncle and Aunt.  Upon CSB's objection, the juvenile court vacated the magistrate's decision and remanded the matter to

---

[1] At some point relevant to these matters, Uncle married his fiancée.  Accordingly, this Court will henceforth refer to the fiancée as "Aunt."

the magistrate for consideration of Foster Parents' motion to modify the legal custody of the child. In the meantime, Father filed a motion requesting visitation.

{¶6} After a hearing, the magistrate granted Foster Parents' motion to intervene solely for the purpose of prosecuting their motion. After finding no change in circumstances for the child or legal custodians, the magistrate denied Foster Parents' motion for legal custody and ordered the case be docketed closed. The decision expressly retained J.B. in the legal custody of Uncle and Aunt. Mother and Father were granted weekly supervised visitation. Foster Parents filed timely objections, while they and other parties filed other various motions. The juvenile court referred the matter to mediation, which was ultimately unsuccessful.

{¶7} The juvenile court issued two orders close in time, ruling on various pending motions and Foster Parents' objections. The court made CSB a party to the proceedings over the agency's objection and placed J.B. under the agency's protective supervision while the child remained in the legal custody of Uncle and Aunt. Mother and Father were granted weekly visitation which was to be supervised by Uncle and/or Aunt without Foster Parents present. The juvenile court granted Foster Parents' motion to intervene solely for the purpose of prosecuting their motion for legal custody, as the court agreed with the magistrate's finding that they had not stood in loco parentis to the child. It further concluded that Foster Parents lacked standing to challenge any order requiring Mother and Father to pay child support. Of particular importance, the juvenile court found that the magistrate had erred by finding that no change in the circumstances of the child or legal custodians had occurred since the award of legal custody to Uncle and Aunt. Instead, the trial court found that the fraud perpetrated on the court by Foster Parents, Uncle, and Aunt at the time of the first legal custody hearing constituted the necessary change of circumstances required to prove the threshold issue pursuant to an R.C. 2151.42(B)

modification of legal custody proceeding as the court was unaware of the true circumstances at that time. As the juvenile court found evidence of the requisite change of circumstances, it scheduled the matter for an evidentiary hearing on the remaining issue of the best interest of the child. In the interim, Mother and Father each filed motions to vacate the original judgment granting legal custody to Uncle and Aunt pursuant to Civ.R. 60(B).

{¶8} The juvenile court held an evidentiary hearing on the following pending motions: (1) Foster Parents' motion for legal custody, (2) Mother's motion for legal custody, (3) Father's motion for legal custody, (4) Uncle's and Aunt's oral motion to retain legal custody in the event that the juvenile court denied Foster Parents' motion for legal custody, and (5) Mother's and Father's Civ.R. 60(B) motions. CSB filed a notice asserting that the agency would remain neutral regarding the parents' motions to vacate the original judgment awarding legal custody to Uncle and Aunt. The guardian ad litem did not file a dispositional motion but submitted a report in which she recommended legal custody to Foster Parents.

{¶9} After consideration of the evidence adduced during a multi-day hearing, the juvenile court granted Mother's motion for legal custody and denied all other dispositional motions. The court ordered CSB to provide protective supervision for the purpose of assisting with the transition of the child into Mother's home on a full-time basis, with the express directive that that was to be accomplished within 30 days absent leave of court for an extension of time. Because Mother and Father were residing together, the trial court terminated the order requiring Father to pay child support. The juvenile court overruled Mother's and Father's Civ.R. 60(B) motions to vacate the original order awarding legal custody to Uncle and Aunt as moot. Finally, the court asserted that the bailiff would schedule a review hearing in approximately 60 days. Shortly after the juvenile court issued its judgment, CSB filed a notice informing the court and

parties that the agency had developed a transition plan and that J.B. would be returned to Mother's home on a full-time basis on a specifically identified date.

{¶10}  Foster Parents filed a timely appeal and motion to stay the judgment.  The motion to stay was denied.  Foster Parents raise four assignments of error for review.  This Court consolidates some assignments of error to facilitate the discussion.

Finality and Jurisdiction

{¶11}  Shortly after this appeal was filed, several appellees filed motions to dismiss for lack of a final, appealable order.  This Court provisionally denied the motions to dismiss, reserving the right to revisit the issue in our opinion.  Mother and Father both challenged the finality of the judgment and this Court's jurisdiction in their appellate briefs.  Upon due consideration, we conclude that the juvenile court's order awarding legal custody to Mother is a final, appealable order which we have jurisdiction to review.

{¶12}  This Court has jurisdiction to hear appeals only from final judgments.  Article IV, Section 3(B)(2), Ohio Constitution; R.C. 2501.02.  In the absence of a final, appealable order, this Court must dismiss the appeal for lack of subject matter jurisdiction.  *Seabolt v. Seabolt*, 9th Dist. Summit No. 28669, 2018-Ohio-20, ¶ 3, citing  *Lava Landscaping, Inc. v. Rayco Mfg., Inc.*, 9th Dist. Medina No. 2930-M, 2000 WL 109108 (Jan. 26, 2000).  "An order is a final appealable order if it affects a substantial right and in effect determines the action and prevents a judgment." *Yonkings v. Wilkinson*, 86 Ohio St.3d 225, 229 (1999); *see also* R.C. 2505.02(B)(1).

{¶13}  Mother and Father rely on this Court's dismissal of a parent's appeal for lack of a final, appealable order when the judgment appealed granted legal custody to a third party under an order of protective supervision by the agency.  *In re C.B.*, 9th Dist. Summit No. 29820 (April 6, 2021).  In that journal entry, we explained that pending and unresolved dispositional motions in

that case indicated that the child's "final placement has not yet been determined[.]" *Id.* The instant case is distinguishable.

{¶14} Notwithstanding the juvenile court's attendant order of protective supervision, it is clear that the judgment fully resolved the issue of J.B.'s custodial status. No further dispositional motions remain pending before the juvenile court. The order of protective supervision was not of an indefinite duration, but rather for the 30-day limited purpose of integrating the child into Mother's home full time. Once the agency had effected that purpose, the child would no longer be under protective supervision. The agency filed a notice in the juvenile court identifying the specific date on which J.B. would be placed in Mother's home full time. The attorney for Foster Parents informed this Court during oral argument that the child has been returned to Mother full time. Although the juvenile court record indicates that a review hearing remains scheduled, there are no remaining custodial issues to be determined below. Under these circumstances, this Court concludes that the juvenile court's judgment is final and appealable and, therefore, invokes our subject matter jurisdiction.

## II.

### ASSIGNMENT OF ERROR I

THE TRIAL COURT ERRED IN CONSIDERING THE FUNDAMENTAL RIGHTS OF BIOLOGICAL PARENTS TO RAISE THEIR CHILD UNDER R.C. 2151.414 AFTER PREVIOUSLY FINDING THEM UNSUITABLE FOR CUSTODY RATHER THAN APPLYING THE CORRECT STANDARD FOR MODIFICATION OF LEGAL CUSTODY PURSUANT TO R.C. 3109.04.

### ASSIGNMENT OF ERROR II

THE TRIAL COURT ERRED IN APPLYING THE BEST INTEREST FACTORS RELATIVE TO A PERMANENT CUSTODY MATTER RATHER THAN THE BEST INTEREST FACTORS RELATIVE TO A MODIFICATION OF PARENTAL RIGHTS AND RESPONSIBILITIES.

{¶15} Foster Parents argue that the juvenile court applied the incorrect legal standard and factors when considering the parties' motions for legal custody. This Court disagrees.

{¶16} Foster Parents challenge the juvenile court's application of statutory law. Accordingly, this Court reviews the matter de novo. *In re Adoption of G.W.K.*, 9th Dist. Wayne Nos. 22AP0006 and 22AP0007, 2022-Ohio-2620, ¶ 14.

{¶17} It is well settled that "the juvenile court derives its sole authority in dependency, neglect, and abuse cases from the comprehensive statutory scheme set out in R.C. Chapter 2151." *In re B.H.*, 9th Dist. Summit Nos. 29998 and 29999, 2021-Ohio-4152, ¶ 25, citing *In re A.P.*, 9th Dist. Medina No. 12CA0022-M, 2012-Ohio-3873, ¶ 16. The statutory scheme provides clear guidance to a juvenile court faced with a request to modify the legal custody of a child who was previously adjudicated a dependent, neglected, or abused child. R.C. 2151.42(B) provides:

> An order of disposition issued under division (A)(3) of section 2151.353, division (A)(3) of section 2151.415, or section 2151.417 of the Revised Code granting legal custody of a child to a person is intended to be permanent in nature. A court shall not modify or terminate an order granting legal custody of a child unless it finds, based on facts that have arisen since the order was issued or that were unknown to the court at that time, that a change has occurred in the circumstances of the child or the person who was granted legal custody, and that modification or termination of the order is necessary to serve the best interest of the child.

{¶18} A year after the juvenile court awarded legal custody of J.B. to Uncle and Aunt and closed the case, Foster Parents filed a motion for legal custody of the child. Nevertheless, the trial court properly construed the motion as a request to modify the order of legal custody. *See In re A.P.*, 9th Dist. Lorain No. 20CA011638, 2021-Ohio-1229, ¶ 10 ("Regardless of the label that [the moving party] put on the motion or its argument in support, the fact remains that the [moving party] was asking the trial court to modify or terminate its prior judgment placing [the child] in the legal custody of [another person].")

**{¶19}** The juvenile court found that, based on facts that were unknown to it at the time it granted legal custody to Uncle and Aunt, a change had occurred in the circumstances of the child or the legal custodians. Foster Parents do not challenge this finding. They argue that the trial court erred by applying the best interest factors enumerated in R.C. 2151.414(D) in lieu of those set out in R.C. 3109.04(F). Specifically, they argue that "the trial court's prior finding of [the parents'] unsuitability [inherent upon the child's adjudication as a dependent child] moved this case to a R.C. 3109.04 case concerning any modifications." Foster Parents assert, therefore, that any consideration of Mother's and Father's fundamental rights was contrary to law.

**{¶20}** We have already explained above that modifications of legal custody in dependency/neglect/abuse cases are governed by R.C. 2151.42(B), not R.C. 3109.04, which addresses modifications of shared parenting orders and awards of parental rights and responsibilities. Moreover, Foster Parents' key assertion is flawed. The Ohio Supreme Court addressed the interplay between a parental unsuitability determination and fundamental rights. In that regard, the high court held:

> A juvenile court adjudication of abuse, neglect, or dependency is a determination about the care and condition of a child and implicitly involves a determination of the unsuitability of the child's custodial and/or noncustodial parents. It does not, however, permanently foreclose the right of either parent to regain custody, because it is not a termination of all residual parental rights, privileges, and responsibilities, and therefore a motion for a change of custody could be filed in a proper case in accordance with law.

*In re C.R.*, 108 Ohio St.3d 369, 2006-Ohio-1191, ¶ 23, citing R.C. 2151.42.

**{¶21}** The juvenile court addressed Mother's and Father's fundamental parental rights within the unique factual context of this case. Given the apparent collusion between Foster Parents and the legal custodians to give de facto custody to Foster Parents in the absence of court approval, the juvenile court expressed its concern that the ultimate goal of those four persons was to

circumvent the law to allow Foster Parents to seek the adoption of the child outside the procedural safeguards enacted for the benefit of parents facing the termination of their parental rights. The juvenile court did not accord Mother's and Father's parental rights paramount consideration here. Instead, the trial court invoked the parents' rights when offering a cautionary tale regarding its fear that third parties in future cases might similarly collude to determine a child's custody in contravention of court order, but worse yet for financial gain.

{¶22} In considering the merits of the pending motions to modify the award of legal custody regarding J.B., the juvenile court referenced and properly applied R.C. 2151.42(B). After making the threshold determination of the requisite change in circumstances, the trial court considered the best interest of the child. It applied the best interest factors enumerated in R.C. 2151.414(D) and R.C. 3109.04(F). This comports with well settled law.

> The statutory scheme regarding an award of legal custody does not include a specific test or set of criteria, but Ohio courts agree that the juvenile court must base its decision to award legal custody on the best interest of the child. *In re B.B.*, 9th Dist. Lorain No. 15CA010880, 2016-Ohio-7994, ¶ 18, quoting *In re N.P.*, 9th Dist. Summit No. 21707, 2004-Ohio-110, ¶ 23. In that regard, the juvenile court is guided by the best interest factors enumerated in R.C. 2151.414(D) relating to permanent custody. *In re B.G.*, 9th Dist. Summit No. 24187, 2008-Ohio-5003, ¶ 9, citing *In re T.A.*, 9th Dist. Summit No. 22954, 2006-Ohio-4468, ¶ 17. Those factors include the interaction and interrelationships of the child, the child's wishes, the custodial history of the child, the child's need for permanence, and whether any of the factors in R.C. 2151.414(E)(7)-(11) are applicable. R.C. 2151.414(D)(1)(a)-(e); *see also In re B.C.*, 9th Dist. Summit Nos. 26976 and 26977, 2014-Ohio-2748, ¶ 16. In addition, the juvenile court may also look to the best interest factors in R.C. 3109.04(F)(1) for guidance. *In re K.A.*, 9th Dist. Lorain Nos. 15CA010850 and 15CA010860, 2017-Ohio-1, ¶ 17. While some factors overlap with those above, others include the child's adjustment to his or her environment; the mental and physical health of all persons involved; the parents' history of providing support and honoring companionship orders; certain indicia of violence, abuse, or neglect in any household involved; and whether a parent plans to or has established a residence outside of Ohio. R.C. 3109.04(F)(1).

*In re B.D.*, 9th Dist. Summit Nos. 30194, 30195, and 30196, 2022-Ohio-1832, ¶ 15.

{¶23} As the juvenile court recognized Foster Parents' motion for legal custody as a request to modify Uncle's and Aunt's existing award of legal custody, applied the standard set forth in R.C. 2151.42(B) relevant to such modifications, and utilized the mandatory best interest factors in R.C. 2151.414(D), as well as the permissible supplemental best interest factors in R.C. 3109.04(F), this Court concludes that the trial court properly applied the law in this case. Accordingly, Foster Parents' first and second assignments of error are overruled.

## ASSIGNMENT OF ERROR III

THE TRIAL COURT ERRED IN CONSIDERING FACTORS RELATIVE TO A CIVIL RULE 60(B) MOTION WITHOUT FIRST CONSIDERING THE THRESHOLD MATTERS OF THE TIMELINESS OF THAT MOTION AND SERVICE OF THE MOTION.

{¶24} Foster Parents argue that the juvenile court misapplied the legal standard when ruling on Mother's and Father's Civ.R. 60(B) motions to vacate the original order granting legal custody of J.B. to Uncle and Aunt. This Court disagrees.

{¶25} The juvenile court did not address the substantive merits of the parents' Civ.R. 60(B) motions. Rather, because the trial court considered and determined the various motions for legal custody before it, ultimately granting Mother's motion for legal custody, it found that the pending Civ.R. 60(B) motions had been rendered moot. As the juvenile court did not rule on the merits of the parents' motions for relief from judgment, its application of the Civ.R. 60(B) standard for determination of those motions is not before us for consideration.

{¶26} Foster Parents opposed the parents' Civ.R. 60(B) motions and are, therefore, not aggrieved by the juvenile court's refusal to consider the merits of those motions. *See In re A.L.W.*, 9th Dist. Summit No. 27312, 2016-Ohio-911, ¶ 24. Assuming arguendo that the juvenile court misapplied the requisite legal standard for ruling on the Civ.R. 60(B) motions, it is unclear how Foster Parents' prevailing on this assignment of error would inure to their benefit. Any

consideration by this Court of an issue which is not relevant to awarding relief to the appellants would merely be advisory, and we decline to render an advisory opinion. *See Cook v. Criminger*, 9th Dist. Summit No. 22313, 2005-Ohio-1949, ¶ 25 ("This court is loath to issue advisory opinions which do not serve to materially advance correct disposition of the matter on appeal. We will not issue a decision which does not affect the case before us."). Foster Parents' third assignment of error is overruled.

### ASSIGNMENT OF ERROR IV

THE TRIAL COURT'S DECISION PLACING THE MINOR CHILD IN THE CUSTODY OF HIS MOTHER WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND NOT IN THE BEST INTEREST OF THE CHILD.

{¶27} Foster Parents argue that the juvenile court's order granting legal custody of J.B. to Mother is against the manifest weight of the evidence. This Court disagrees.

{¶28} This Court previously explained in our discussion of the first and second assignments of error that R.C. 2151.42(B) governs the juvenile court's determination whether to modify the legal custody of a child previously adjudicated dependent, neglected, or abused and placed in someone's legal custody. The statute requires findings that there has been a change in circumstances of the child or the legal custodians and that a modification of legal custody is in the child's best interest. As noted above, Foster Parents do not challenge the juvenile court's finding that the requisite change of circumstances occurred. Accordingly, this Court here considers only the issue of the best interest of the child.

> On appeal, an award of legal custody will not be reversed if the judgment is supported by a preponderance of the evidence. Preponderance of the evidence entails the greater weight of the evidence, evidence that is more probable, persuasive, and possesses greater probative value. In other words, when the best interest of the child is established by the greater weight of the evidence, the trial court does not have discretion to enter a judgment that is adverse to that interest. Thus, our standard of review is whether a legal custody decision is against the manifest weight of the evidence.

(Internal citations and quotations omitted.) *In re M.F.*, 9th Dist. Lorain No. 15CA010823, 2016-Ohio-2685, ¶ 7.

{¶29} In considering whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered." (Internal quotations omitted.) *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. When weighing the evidence, this Court "must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21.

{¶30} The relevant best interest factors include those enumerated in R.C. 2151.414(D)(1)(a)-(e) and R.C. 3109.04(F)(1). Those factors include the interaction and interrelationships of the child; the child's wishes; the custodial history of the child; the child's need for permanence; the applicability of any R.C. 2151.414(E)(7)-(11) factors; the child's adjustment to his environment; the mental and physical health of all parties involved; the history of providing support and honoring companionship orders; certain indicia of violence, abuse, or neglect in any household involved; and any prospective custodians' plans to establish a residence outside of Ohio.

{¶31} Much of the evidence below focused on matters that occurred prior to the reopening of the case and, in fact, prior to the juvenile court's award of legal custody to Uncle and Aunt in May 2019. For example, there was detailed testimony discussing the agreement by Uncle, Aunt, and Foster Parents to maintain the child in Foster Parents' home despite the official change of placement to Uncle's and Aunt's home, as well as after the juvenile court awarded legal custody of J.B. to those relatives. In addition, various parties rehashed Mother's and Father's issues that gave rise to the initial determination of their unsuitability, and the parents' prior lack of case plan

compliance that supported the award of legal custody to Uncle and Aunt. Certainly, those matters provide context and are relevant in some respects. However, where a court considers a modification of a prior legal custody order, evidence of the current circumstances since the prior disposition is key to determining the child's best interest.

{¶32} The evidence demonstrated that, during the case prior to its reopening, Uncle, Aunt, and Foster Parents all agreed to maintain J.B. in Foster Parents' home without the knowledge of the juvenile court, the guardian ad litem, and the parents. Foster Parents' motion for legal custody alleged only that they had had placement of the child for several months before the agency moved the child into Uncle's and Aunt's home. The U.C.C.J.E.A. affidavit attached to the motion listed Uncle's and Aunt's address as the child's residence. In fact, information regarding the child's true residence was not disclosed until a hearing several months after Foster Parents filed their motion for legal custody. The evidence demonstrated that J.B. had never spent a single night in Uncle's and Aunt's home, but rather lived exclusively with Foster Parents his whole life.

{¶33} The CSB foster home coordinator assigned to Foster Parents testified that J.B. was never in Foster Parents' home during her always pre-scheduled home visits, reasonably indicating Foster Parents' understanding that their providing the sole home for the child was not approved. Although Foster Parents, Uncle, and Aunt testified that they believed that the agency caseworker had tacitly approved their plan for Foster Parents to have physical custody of J.B. and to later seek a modification of legal custody, the caseworker denied the accusation.[2]

---

[2] Foster Mother testified that she transported the child to Uncle's and Aunt's home for the agency's home visits as "arranged [by the caseworker] with a wink and a nudge[.]" She further testified that the child's caseworker asserted "off the record" that Foster Parents could get legal custody of J.B. after Uncle and Aunt were awarded legal custody.

{¶34} On the other hand, an agency caseworker assigned to another foster child who was placed in Foster Parents' home after J.B.'s placement was transferred to Uncle and Aunt testified that J.B. was always in Foster Parents' home during visits she made in relation to that other foster child. That caseworker testified that Foster Parents told her that J.B. had been placed in Uncle's and Aunt's custody and that the child's caseworker told them that "when the case was closed, * * * they can file for custody privately * * * once the agency was no longer involved." The other foster child's caseworker testified that such advice "seemed strange" to her and that she and her supervisor "would never recommend to have the case close and then transfer custody."

{¶35} Foster Parents, Uncle, and Aunt all admitted that, since the child's placement by the agency in the relatives' home, J.B. had never resided in Uncle's and Aunt's home. Uncle testified that he believed that the child was "better off" with Foster Parents. The two couples enjoyed a very friendly relationship that they referred to as akin to family. Accordingly, Uncle and Aunt saw J.B. regularly at events like cookouts, birthday parties, and dance recitals. Uncle and Aunt also enjoyed FaceTime calls with the child, as well as pictures sent by Foster Mother. Uncle described his relationship with the child as typical for any uncle and nephew. Aunt testified that, during the month immediately preceding the final hearing date, she and Uncle had seen J.B. 15 times in the course of "normal aunt and uncle visitation."

{¶36} In the meantime, after Uncle and Aunt obtained legal custody, Uncle limited Mother's visits to one hour per week. The evidence indicated that the child enjoyed play dates

with friends that lasted longer than the time Mother was permitted to spend with her child. Uncle testified that he understood Mother's visitation lay in his discretion, and he admitted he refused to increase the duration of Mother's visits. Uncle admitted that, while Mother requested longer visits, he refused. He admitted that he did not always respond to Mother's requests for visitation in a timely manner. In addition, when Mother asked to be able to visit with J.B. in her home, her mother's home, the legal custodians' home, or a private visitation center, Uncle refused all those requests.

{¶37} Uncle informed Mother that Foster Parents would attend all visitations, reasoning that it would be beneficial for the child to see that all the adults involved in his life could get along. Mother testified that the presence of Foster Parents, and Foster Mother in particular, detracted from her ability to interact and work on developing a bond with J.B., as the child's attention frequently shifted to the caregivers with whom he was most familiar. The juvenile court ordered that Foster Parents were no longer to be present for parental visits. Even so, Foster Mother and the legal custodians disregarded the court's order by allowing Foster Mother to transport the child for visits.

{¶38} Aunt also denied visits to Mother and Father, sometimes claiming that she and Uncle were too busy to accommodate the weekly visitation. Aunt disregarded Father's establishment of paternity and refused to allow him to visit with J.B. because the paternity test was not court-ordered and Father's name was not on the child's birth certificate. Aunt testified that she had recently ceased all communications with Mother, leaving all matters regarding the child and his parents to Uncle to address. Accordingly, Aunt effectively admitted that, although she was the child's legal custodian, she abdicated her responsibility to recognize Mother's and Father's residual parental rights, as she refused to maintain a relationship with either parent.

{¶39} When Uncle finally recognized Father had a right to visit with the child, Uncle insisted that Father merely observe two of Mother's visits without having any interaction with the child. When Father approached the child at one point, Aunt and Uncle grabbed the child and whisked him away. Because Father, Aunt, and Uncle were all yelling about the situation, an onlooker called the police.

{¶40} With court intervention, Mother and Father were able establish a routine visitation schedule. The parents consistently exercised their visitation rights during the last eight months of the case. All parties agreed that Mother and Father interacted positively with the child, brought age-appropriate activities and food, and began to develop a bond with J.B. The parents were able to enjoy minimally increased visitation, although not as much as the juvenile court had anticipated. Mother's and Father's visits progressed to being unsupervised, and the child began to refer to his parents as "mom" and "dad."

{¶41} Unfortunately, Aunt and Uncle continued to attempt to thwart the parents' goal to reunify with J.B. In the original case, they encouraged Mother to relinquish her parental rights to them in exchange for the promise of unfettered visitation. After the case was reopened, they told the parents that they would not prevail on their motions and then threatened Mother and Father that CSB would remove the baby they were expecting if they continued to seek legal custody of J.B.

{¶42} When addressing the parents' limited access to the child, Foster Parents, Aunt, and Uncle shifted the responsibility for facilitating visitation to one another or the parents. Foster Father testified that he let his wife handle all matters involving the child. Foster Mother testified that she did not contact Mother or attempt to schedule visits because that was not her role, as she was not the legal custodian. Aunt eventually ceased communications with Mother after a

disagreement. Uncle testified that Mother failed to reach out to him to express much interest. The Facebook Messenger texts admitted into evidence indicate, however, that Mother inquired regarding the child's whereabouts, and asked to see J.B. In one message to Mother denying her request for a visit, Uncle wrote that Mother was acting "entitled," that her sobriety was "no big deal," and that Mother had no right to say how or where visits would occur because she contributed nothing to the child and deserved nothing.

{¶43} Foster Parents, Uncle, and Aunt admitted that they did not notify Mother or Father regarding any of the child's medical appointments or recent engagement in counseling. No one invited the parents to the child's birthday parties. Although Foster Mother owned the dance studio where the child was taking lessons, she did not invite the parents to the child's dance recital, testifying that there was "limited seating for this event."

{¶44} Despite the long-term concerted efforts of Foster Parents, Uncle, and Aunt, however, once Mother and Father were able to consistently spend time with J.B., a comfortable relationship and parent-child bond began to develop quickly. As noted above, the child has begun to call his parents "mom" and "dad," he enjoys his time with them, and he seeks comfort from them.

{¶45} J.B. also refers to Foster Parents as "mommy" and "daddy." Uncle admitted that he never discouraged that. The child is comfortable in Foster Parents' home, and shares a strong bond with them, their 18-month-old daughter, and live-in adult niece. J.B. was almost three years old when the three-day hearing concluded, and he had spent his entire life in Foster Parents' care. The caseworker and guardian ad litem testified that Foster Parents' home is safe and appropriate. They are able to provide for the child's basic needs. While Foster Parents provide for the child's emotional needs within the environment they have circumscribed, in conjunction with Uncle and

Aunt, they have limited J.B.'s exposure to Mother and Father with whom he should have been permitted to develop an emotional bond.

{¶46} Mother and Father are in a committed relationship and are expecting a baby together. They are both employed and able to meet the basic needs of their family. The parents have stable housing, having recently signed a new one-year lease on their home. They have a bed, car seat, clothing, and other necessities for J.B. Both the caseworker and guardian ad litem testified that the parent's home is physically safe and appropriate for the child.

{¶47} The issues that originally brought J.B. into the agency's care include Mother's drug use and lack of employment and housing. Father was not involved when the agency prosecuted the case initially. After the case was reopened, Mother and Father demonstrated that they had remedied the conditions underlying the prior finding of their unsuitability. They obtained stable employment and housing. Moreover, both parents overcame their substance abuse issues and attained sustained sobriety.

{¶48} Mother and Father previously used methamphetamine and struggled with addiction. After a criminal drug charge, Mother voluntarily participated in Summit County Drug Court, completed the Turning Point program (consisting of intensive outpatient treatment, aftercare, counseling and educational programs, and random drug screens), and continues to engage in ongoing counseling aimed at relapse prevention. Mother had been sober for 20 months by the conclusion of the hearing. Mother has established a support system that includes counseling, attending Narcotics Anonymous meetings, and family support. Her drug charge was dismissed and record expunged as a result of her successful completion of the drug court requirements. Uncle and Aunt admitted that Mother had maintained sobriety.

{¶49}   Father also had approximately a year and a half of sustained sobriety by the end of the case. Although he had not participated in any recent substance abuse treatment, he testified that he was motivated to abstain from methamphetamine based on his commitment to Mother and their children. He attends Narcotics Anonymous meetings with Mother, has a family support system, and no longer associates with the people with whom he used to use drugs. Father has a medical marijuana card and uses marijuana occasionally as authorized for chronic back pain.

{¶50}   At the end of the second hearing day, the juvenile court asked Father if he would agree to submit to drug testing and obtain a mental health assessment, to clear up issues raised by Uncle, Aunt, and the caseworker. Father agreed. He tested negative for drug use. He obtained a mental health assessment and signed a release of information so CSB could receive the results. The evaluation report was not available by the time of the hearing, but the caseworker was able to speak to Father's case manager who reported that it was recommended that Father participate in weekly and monthly counseling sessions to address his historical substance abuse issues and current marijuana use. Father testified that he was willing to comply with those recommendations for counseling.

{¶51}   The CSB caseworker testified that the agency supports granting Foster Parents' motion for legal custody because "that is what [the child] knows." She admitted that she had only observed one of Mother's and Father's visits and that it had gone well. She emphasized, however, that it is well understood that the trauma associated with a child's removal from his home is "very significant." Mother responded that the child's potential removal from non-relatives and the concomitant trauma associated with that situation never should have existed, because J.B. should have been living with his relatives-legal custodians. Mother testified, "I believe if they [Uncle, Aunt, and Foster Parents] were honest and if [the child] was in my family member's care like he

was supposed to be, that my son wouldn't have to go through this traumatic event. And I'm very hurt and angered that he does have to." Mother added that, if Uncle and Aunt had not placed J.B. with Foster Parents and had him call them "mom" and "dad," the child "would have known us [Mother and Father] as his parents."

{¶52} The guardian ad litem testified that, during an unsupervised visitation, J.B. was very comfortable with Mother and Father, recognized them as "mom" and "dad," and seemed to enjoy his time with his parents. Mother and Father chose appropriate activities for the child. The child wanted Mother to hold him. The guardian ad litem testified that the child's bond with his parents was clearly developing. Nevertheless, she issued a "strong recommendation" that J.B. remain in Foster Parents' home in the child's best interest. She based her recommendation solely on the child's attachment to Foster Parents. The guardian ad litem likened J.B.'s removal from Foster Parents as "punish[ment]" for the innocent child, although she conceded that Foster Parents "should not be rewarded for bad behavior[.]"

{¶53} If the juvenile court were to award legal custody of the child to Mother and/or Father, the guardian ad litem testified that she agreed with the agency's proposed plan to transition J.B. into his parents' home. That plan would include expanded visits, overnight stays, and culminate in the child's full-time assimilation into Mother's and Father's home. The guardian ad litem, as well as every other party who testified on the subject, advised that the child's counselor play a significant role in helping with any transition, as well as J.B.'s understanding of his identity and the role of the adult caregivers in his life. Mother and Father agreed that they would maintain the child in counseling and consult her for advice regarding the child's acclimation to his circumstances.

{¶54} Based on a thorough review of the record, this is not the exceptional case in which the trier of fact clearly lost its way and created a manifest miscarriage of justice by awarding legal custody to Mother. Uncle and Aunt were the child's legal custodians but never took physical custody of the child and left his daily care to Foster Parents. Uncle and Aunt conspired with Foster Parents to significantly limit the child's interaction and relationship with his parents. From almost the beginning of the original case, the two couples facilitated a plan to allow Foster Parents to later obtain legal custody in the hopes of eventually adopting J.B.

{¶55} Foster Parents provided a safe, stable, and loving home for the child during his entire short life. They did so, however, by deception, and at the expense of Mother's and Father's residual parental rights. Mother's supposition that J.B. would have known her and Father as his parents and had a much more significant connection with his biological family had Uncle and Aunt honored their commitment as legal custodians is a reasonable one.

{¶56} Uncle and Aunt demonstrated their inability or lack of desire to comply with their duties as legal custodians as delineated in their signed statements of understanding for legal custody. Accordingly, the juvenile court did not err by refusing to maintain J.B. in their legal custody.

{¶57} This case then comes down to determining whether it was in the child's best interest to be placed in the legal custody of nonrelatives or returned to his parents' care. While Foster Parents demonstrated love and commitment to the child, as well as the ability to provide an appropriate home for him, the evidence supports the juvenile court's finding that they would not be inclined to facilitate future parental visitation, thereby further alienating the child from Mother and Father. The bond that was developing between the parents and the child would likely dissipate were Foster Parents, in the name of exercising discretion in the child's best interest, to continue

the pattern of limiting the frequency and duration of Mother's and Father's visits. While the guardian ad litem opined that removal of the child from Foster Parents' home would act as punishment for the child, she did not acknowledge that the parties' denial of visitation for Mother and Father also reasonably punished the child by depriving him of his ability to know and bond with his parents.

{¶58} Mother and Father demonstrated that they had turned their lives around during the past year and a half and remedied the concerns that led to the child's initial removal from their care. Both demonstrated a sustained period of sobriety and had reasonable support systems in place to avoid relapse. Both parents were employed and able provide for their family's basic needs. The parents established safe and stable housing. Although the agency caseworker was concerned about the significant trauma associated with any removal of a child from his home, it is persuasive support for the parents that she testified, "If I were to evaluate [Mother] and [Father] today, I would not remove [J.B.] from their care."

{¶59} The child is in counseling to address his understanding of the situation and the role of the people involved in his life. Mother and Father asserted their commitment to maintaining the child in counseling and relying on the counselor's recommendations to facilitate J.B.'s return to their care. CSB has established transition plans which it uses whenever a child's placement must change. The guardian ad litem testified that she supports that transition plan. J.B. is young and has already demonstrated a resilience and ability to adapt to changing circumstances. In fact, he has already started calling his parents "mom" and "dad" and seeking their comfort.

{¶60} An award of legal custody to Mother in this case would also offer the child the opportunity to know and grow up with his new sibling. Maintaining that biological relationship cannot be overlooked. It is unclear how J.B. would be able to develop a strong sibling relationship

with his parents' new baby were he to be placed in the legal custody of nonrelatives who historically have not prioritized his relationship with Mother and Father. Under the circumstances, the juvenile court's finding that an award of legal custody to Mother is in J.B.'s best interest is not against the manifest weight of the evidence. Foster Parents' fourth assignment of error is overruled.

III.

{¶61} Foster Parents' assignments of error are overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellants.

BETTY SUTTON
FOR THE COURT

CARR, P. J.
CALLAHAN, J.
CONCUR.

APPEARANCES:

CORINNE HOOVER SIX and LINDSAY L. MORETA, Attorneys at Law, for Appellants.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN R. DIMARTINO, Assistant Prosecuting Attorney, for Appellee.

JASON D. WALLACE, Attorney at Law, for Appellee.

DAVID M. LOWRY, Attorney at Law, for Appellee.

SHUBHRA AGARWAL, Attorneyt at Law, for Appellee.

TYLER WHITNEY and LAWRENCE WHITNEY, Attorneys at Law, for Appellees.

MELISSA GRAHAM-HURD, Attorney at Law, for Appellees.

ANNA BROWN, Guardian ad Litem.